UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

WBSY LICENSING, LLC,

    Plaintiff,

v.

DUVAL COUNTY SCHOOL BOARD,

    Defendant.

Case No.:

## COMPLAINT

WBSY Licensing, LLC, by its undersigned counsel, hereby alleges the following for its complaint against Defendant Duval County School Board:

## NATURE OF THE ACTION

1. In this action, WBSY Licensing, LLC ("WBSY")—a subsidiary of T-Mobile US, Inc. ("T-Mobile")—seeks an order requiring the Duval County School Board (the "Board") to fulfill its contractual obligation to sell its Federal Communications Commission ("FCC") license to use certain wireless spectrum in the Jacksonville, Florida area (the "License") to WBSY. The parties' 2017 contract gives WBSY the clear, unilateral right to purchase the License for a specified price. Once WBSY has provided written notice of its intent to exercise its purchase right, the Board "will enter into a purchase and sale agreement" for the license "[p]romptly." WBSY gave such written notice on August 26,

2020, yet the Board has refused to fulfill its obligation to execute the asset purchase agreement.

2.  This is a straightforward case of seller's remorse; the Board now believes the agreed purchase price is too low. But the fact that a party wishes it had struck a better deal is no basis for refusing to enforce the one it struck. WBSY respectfully asks the Court to require the Board to specifically perform its obligation to sell the License to WBSY.

* * * * *

3.  The Board holds an FCC license to use four unique "channels" of radio-frequency spectrum in the Jacksonville, Florida area (the "License"). WBSY's business is to acquire and hold the rights to use wireless spectrum. Under the parties' June 29, 2017 contract (the "Lease Agreement"), WBSY leases from the Board ninety-five percent of the spectrum covered by the License.[1] Among other provisions, the Lease Agreement gives WBSY the right, if permitted by the FCC, "to purchase the [spectrum] Channels covered by the Agreement (the 'Purchase Right') at any time during the Term for the sum of all remaining Monthly Fee payments (the 'Purchase Price')." At the time of

---

[1] WBSY is the successor in interest to original signatory Clearwire Spectrum Holdings III LLC. *See* Ex. A (Assignment Agreement). The assignment to WBSY took effect upon FCC approval on March 20, 2020. *See* Ex. B (FCC ULS Record of Lease for WLX922).

filing this complaint, the Purchase Price is ▮▮▮▮▮▮▮▮. The Lease Agreement further requires that, "[p]romptly after Licensee receives written notice of [WBSY's] intent to exercise its Purchase Right, the Parties will enter into a purchase and sale agreement[.]"  Ex. C (Lease Agreement) § 3(e).

4. On August 26, 2020, WBSY sent a letter notifying the Board that WBSY was exercising its right to purchase the License. WBSY attached to the letter a draft Asset Purchase Agreement and requested that the Board execute and return it by September 11, 2020. The Board did not respond. WBSY followed up several times in correspondence between September and December 2020. The Board initially responded that the Asset Purchase Agreement was "in review."

5. Eventually, on June 30, 2021, Tajit Mehta and Angie Hirzel of WBSY had a call with Jim Culbert, Chief Information Officer for the Duval County Public Schools, to discuss the Purchase Right. On that call, Mr. Culbert claimed that WBSY's Purchase Right was unenforceable and implied that the Lease Agreement was null and void because it was signed by the Duval County Public Schools' Chief Academic Officer rather than its Superintendent. Mr. Culbert stated that other educational institutions were selling their licenses to "other players" for more money and demanded that WBSY make the Board a "real" offer—i.e., one for an amount greater than the Board had contractually agreed to accept if WBSY exercised its Purchase Right. Mr.

Culbert also asserted that the Board already had other offers for the License and had hired a legal team.

6. The Board's refusal to sell the License for the agreed price is a straightforward breach of the Lease Agreement. WBSY has no adequate remedy at law for this breach because of the inherently unique nature of the wireless spectrum covered by the License. As a matter of physics, wireless spectrum is irreplaceable, and WBSY cannot substitute other spectrum for the channels covered by the License without materially degrading T-Mobile's network performance. Further, the Board's rejection of WBSY's Purchase Right deprives WBSY of definite *ownership rights*—rather than merely leaseholder rights—to the spectrum covered by the License. Thus, the Board's breach deprives WBSY of the right to purchase a singular, irreplaceable asset. The parties were fully aware of this when they signed the Lease Agreement. That is why the Board explicitly "acknowledge[d]" in Section 20(d) of the Lease Agreement that "the License and Channels subject to this Agreement are unique"; that "the loss to [WBSY] due to Licensee's failure to perform this Agreement could not be easily measured in damages"; and that WBSY consequently "will be entitled to injunctive relief and specific enforcement of this Agreement."

## **PARTIES, JURISDICTION, AND VENUE**

7. WBSY is a limited liability company organized under the laws of Delaware, with its principal place of business in Bellevue, Washington. Its sole member is SprintCom, Inc., a corporation incorporated in Kansas with its principal place of business in Bellevue, Washington. Accordingly, WBSY is a citizen of Kansas, Washington, and no other state.

8. The Board is a government agency created under the laws of the State of Florida and located within this District. Accordingly, the Board is a citizen of Florida and no other state. The Board is the governing body for the Duval County School District and is responsible for the control, operation, organization, management, and administration of public schools in Duval County. It also is the party that entered into the Lease Agreement.

9. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and the claim is between citizens of different states.

10. This Court has personal jurisdiction over the Board because it is organized and exists in Florida, its principal place of business is in Florida, and it committed the acts complained of in Florida.

11. This District is a proper venue under 28 U.S.C. § 1391(b), because the Board resides in this District, and a substantial part of the events or omissions giving rise to WBSY's claims occurred in this District.

## FACTUAL ALLEGATIONS

### I. The License

12. The Board has long held the License to use four channels of radio-frequency spectrum in and around Jacksonville, Florida. The channels are designated A1, A2, A3, and A4, and the FCC call sign for the License is WLX922.

13. The licensed channels are part of the Educational Broadband Service ("EBS"), which is a range of spectrum that the FCC historically has licensed to educational entities. There are 20 EBS channels in any given geographic market, each of which physically occupies a unique place within the electromagnetic spectrum. They fall within the band of spectrum from 2496 to 2690 MHz, which is commonly referred to as the "2.5GHz" band of spectrum.

14. Prior to April 2020, FCC regulations allowed only educational entities to hold EBS spectrum licenses. The FCC, however, permitted EBS licensees such as the Board—most of which lack the technical knowledge, expertise, and infrastructure to operate a telecommunications network—to lease all but five percent of their spectrum to non-educational entities such as WBSY. Nearly all of the 1,300 EBS licensees nationwide leased their unused

spectrum in this manner.  This includes the Board, which entered into an earlier lease agreement with WBSY's predecessor in interest, which was replaced in 2017 by the Lease Agreement at issue here.  These EBS leases took spectrum that otherwise would have gone unused and repurposed it to support modern high-speed broadband telecommunications services.

15. Effective April 27, 2020, the educational-use requirement for EBS licenses was eliminated.  According to the FCC, this change was enacted because "technological changes over the last 30 years enable any educator with a broadband connection to access a myriad of educational resources." Transforming the 2.5GHz Band, 86 Fed. Reg. 10839, 10840 (2021).  Hence, "[o]nly a handful of EBS licensees ha[d] deployed their own networks or use[d] their EBS licenses in a way that require[d] dedicated spectrum.  Instead, most licensees rel[ied] on lessees [such as WBSY] to deploy and operate broadband networks and use[d] the leases as a source for revenues or devices." *Id.* Such is the case with the Board.

## II.   The Lease Agreement

16. The Board first leased the channels covered by the License in 2002 to an affiliate of Sprint Corporation.  For fifteen years, WBSY's predecessor in interest duly made payments under the terms of that lease.  Around February 2017, WBSY's predecessor sought to replace the original EBS lease agreement with one that conformed with recent FCC rule changes.

7

17. On April 6, 2017, Mr. Mehta wrote to John Phillips, Duval County Public Schools' Head of Broadcasting, to inquire whether the Board had executed the new Lease Agreement. Mr. Phillips responded that the document had not yet been executed, but that he would "request another meeting to get this signed." Two weeks later, Mr. Mehta followed up again, and Mr. Phillips indicated that he hoped the Lease Agreement would be executed by the end of that week.

18. Duval eventually executed the Lease Agreement on June 29, 2017. The Lease Agreement was signed by Duval County Public School's Chief Academic Officer, William Mason Davis.

19. In Section 17(a) of the Lease Agreement, each party "represent[ed] and warrant[ed]," among other things, that it had "the full right and authority to enter into, execute, deliver, and perform its obligations"; that each "has taken all requisite corporate action to approve the execution, delivery and performance" of the Lease Agreement; and that the Lease Agreement "constitutes a legal, valid and binding obligation enforceable against such Party in accordance with its terms."

20. Upon information and belief, Mr. Davis was actually authorized to sign the Lease Agreement on behalf of the Board.

21. Regardless, Mr. Davis had apparent authority to sign the Lease Agreement. Mr. Mehta and Mr. Phillips, in his capacity as Head of

8

Broadcasting, engaged in extensive correspondence leading up to signing the Lease Agreement, which included Mr. Phillips' assurances that he would "request another meeting to get this signed" and that "[h]opefully it will get signed by the end of the week." Mr. Phillips is listed as the Board's representative in FCC EBS license filings dating back to 2010. *See, e.g.*, Exs. D (2010 License Modification Application); E (2013 License Renewal Application). When Mr. Davis emailed the signed Lease Agreement to WBSY, he copied Mr. Phillips, and neither Mr. Phillips nor any other Board representative disputed its validity or binding effect.

22. After the 2017 Lease Agreement was executed, Mr. Phillips completed, on behalf of the Board, a Licensee and Electronic Filing Information Form, which is the licensee's required portion of the FCC filing updating any EBS lease agreement.

23. The Lease Agreement grants WBSY the right to use the Board's EBS channels (except for five percent of the spectrum capacity, in accordance with FCC requirements at the time) in exchange for an initial fee plus a fixed monthly royalty fee.

24. On September 6, 2017, WBSY's predecessor issued to the Board a check that covered the initial fee, the prorated monthly fee for August 2017, and the monthly fee for September 2017. The check was made out to "Duval County School Board" and mailed to Duval County Public Schools' offices at

9

1701 Prudential Drive, Jacksonville, Florida 33207. The Board cashed the check on September 21, 2017.

25. In October 2019, WBSY's predecessor sent Mr. Phillips a Current Contact Form, which collected the Board's updated contact information in order to coordinate the parties' dealings pursuant to the Lease Agreement. WBSY also sent a copy of the Lease Agreement to Mr. Phillips, copying Brian McDuffie, Duval County Public Schools' Executive Director for Policy and Compliance. The contact information form ultimately was executed by Paula Renfro, Duval County Public Schools' new Chief Academic Officer, who wrote in herself and Mr. Phillips as contacts.

26. Since the parties executed the Lease Agreement in 2017, WBSY or its predecessor has timely paid every monthly fee due under the Lease Agreement. The Board, with knowledge of all material facts surrounding the execution of the Lease Agreement, has knowingly accepted each monthly payment in exchange for WBSY's use of the spectrum covered by the License without ever disputing the validity of the Lease Agreement. The Board has continued to accept the monthly fee payments after WBSY provided notice that it was exercising its Purchase Right in August 2020. In total, from June 2017 through July 2021, WBSY and its predecessor have paid the Board ▮▮▮▮ under the Lease Agreement.

27. Under Section 3(e) of the Lease Agreement, WBSY has the right to buy the License "at any time during the Term for the sum of all remaining Monthly Fee payments (the 'Purchase Right')." Ex. C (Lease Agreement) § 3(e).

28. Section 3(e) states, in full:

> **Channel Acquisition**.  Subject to eligibility under FCC rules and receipt of appropriate consents, [WBSY] or its designee has the right to purchase the Channels covered by the Agreement (the "Purchase Right") at any time during the Term for the sum of all remaining Monthly Fee payments (the "Purchase Payment").  ***Promptly after Licensee receives written notice of [WBSY's] intent to exercise its Purchase Right, the Parties will enter into a purchase and sale agreement containing customary terms for the sale of the Channels.***[2]

29. As reflected in this language, the only conditions to WBSY's purchase of the License, besides its provision of written notice of intent, are "eligibility under FCC rules" and "receipt of appropriate consents." *Id.* As for the former, the FCC now permits the purchase and sale of EBS licenses—like the License at issue here—by non-educational entities. Thus, from April 27, 2020, onward, FCC rules have permitted WBSY to purchase the License. As for the latter, the "appropriate consents" condition refers to FCC approval of the sale of the License, a step in the sale process that comes only after the

---

[2] Unless otherwise noted, all emphases are added.

11

Board submits an assignment application to the FCC. To date, the Board has refused to do so, in direct breach of its obligations under the Lease Agreement.

### III. The Board Breaches the Lease Agreement by Failing to Execute the Purchase Right

30. On August 26, 2020, WBSY sent a letter to the Board giving "notice of its intent to exercise its Purchase Right" for the License. Ex. F (Ltr. from H. Brown to P. Renfro (Aug. 26, 2020)). The letter noted that, under Section 3(e) of the Lease Agreement, "the Purchase Payment will be the sum of all remaining Monthly Fee payments under the Lease," which as of the date of the notice letter, totaled ▮▮▮▮▮▮▮, less any monthly fees paid prior to closing. *See id.* Given the intervening lease payments, that amount is, at the time of filing this complaint, ▮▮▮▮▮▮▮.

31. Attached to the August 26 letter was a draft Asset Purchase Agreement. *See id.* WBSY requested that the Board execute the Asset Purchase Agreement and return it via email "no later than September 11, 2020." *Id.* The Board did not execute the Asset Purchase Agreement or otherwise respond to WBSY by that date.

32. On September 15, 2020, WBSY followed up. *See* Ex. G (Email from T. Mehta to P. Renfro & J. Phillips (9/15/2020)). Mr. Mehta left voicemails for Mr. Phillips and Ms. Renfro, and followed up with both via email. *See id.* In his email, Mr. Mehta explained that the FCC recently had updated its

12

purchase process rules, and therefore, he had attached a new version of the Asset Purchase Agreement incorporating revisions to account for the rule changes. *See id.* Mr. Mehta again requested that the Board execute the updated Asset Purchase Agreement. *See id.*

33. On September 24, 2020, Ms. Renfro responded that the Asset Purchase Agreement was "in review" and that she hoped "to have feedback to you no later than Wednesday." *See* Ex. G (Email from P. Renfro to T. Mehta (Sept. 24, 2020)). Neither Ms. Renfro nor Mr. Phillips followed up after this email.

34. On December 15, 2020, Mr. Mehta sent another email to Ms. Renfro and Mr. Phillips, requesting an update on the status of the Asset Purchase Agreement so that WBSY could begin the FCC filing process. *See* Ex. G (Email from T. Mehta to P. Renfro & J. Phillips (Dec. 15, 2020)). Neither responded, and the Board continued accepting WBSY's monthly payments under the Lease Agreement.

### IV. The Board Asserts that WBSY's Purchase Right is Invalid

35. Finally, Mr. Culbert, Ms. Renfro, and Tanya Riggio, also of Duval County Public Schools, contacted WBSY by phone on June 30, 2021. On that call, Mr. Culbert stated that the Board was no longer happy with the deal it struck in June 2017, and made a number of assertions that are flatly inconsistent with the terms of the Lease Agreement.

36. First, Mr. Culbert asserted that the Board had not validly executed the Lease Agreement because it had been signed by Duval County Public Schools' then-Chief Academic Officer, Mr. Davis, rather than the Superintendent of Duval County Public Schools. Mr. Culbert suggested that the Lease Agreement was null and void as a result.

37. Mr. Culbert also asserted that WBSY's Purchase Right under Section 3(e) was unenforceable because, at the time the Lease Agreement was signed in June 2017, the purpose of the License was for Duval County Public Schools to broadcast educational programming. He did not explain how, even if that proposition was true—which it is not, as Duval since 2002 has leased 95% of its spectrum to WBSY and its predecessors for commercial use—it could possibly make WBSY's bargained-for purchase right unenforceable.

38. Mr. Culbert then asked WBSY to make a "real" offer for some amount of money plus 10,000 free Wi-Fi hotspots. Mr. Culbert claimed that Florida State College had just sold its EBS license to "another player" and that "other players" have bought up to 50% of T-Mobile's leased EBS license capacity across the United States (which is not true).

39. Finally, Mr. Culbert claimed to have other offers to purchase the License and stated that the Board had hired a legal team.

40. Until this June 2021 communication, the Board never disputed the terms of the contract or the circumstances of its formation. From June 29,

14

2017—the date it executed the Lease Agreement—through the filing of this complaint, the Board has knowingly accepted every monthly fee payment under the Lease Agreement without protest or reservation.  Likewise, since 2017, WBSY or its predecessor has, with the Board's full knowledge and consent, used the spectrum provided under the Lease Agreement as part of T-Mobile's network in the Jacksonville, Florida area.

41. The Board's failure to "[p]romptly" execute the Asset Purchase Agreement breached its obligations under the Lease Agreement.  Its ongoing failure to execute such an agreement is a continuing breach of those same obligations.

## V. The Board's Breach Causes WBSY Irreparable Harm

42. WBSY's Purchase Right in Section 3(e) of the Lease Agreement affords WBSY a guaranteed right to buy the License.  The Board's breach is depriving WBSY of the bargained-for right to own the License and to use the spectrum in perpetuity.  There is no substitute for that right because there is no other mechanism by which WBSY can be certain of acquiring the License.  Owning an asset is, to state the obvious, vastly different than leasing that same asset.  That certainly is true with respect to the License; the ability to lease the spectrum covered by the License for a finite period of time is no substitute for permanent ownership of the License itself.

43. In addition, the spectrum covered by the License is unique. As a matter of physics, each of the four channels at issue physically occupies a distinct space within the electromagnetic spectrum; no other channels exist on the same spectrum bandwidth as those channels in the Jacksonville, Florida area. As such, the License is a singular, irreplaceable asset.

44. With access to the channels at issue, T-Mobile affiliates can transmit over contiguous spectrum within the 2.5GHz band, as they hold licenses to the other channels in that band. Contiguous spectrum blocks provide broad channel bandwidth, which is particularly important to 5G service as well as 4G, LTE service. As a matter of network performance, T-Mobile cannot compensate for the loss of the at-issue channels in the 2.5GHz band by acquiring access to other spectrum bands or other channels within the 2.5GHz band. Removing access to the at-issue channels from what was contiguous spectrum would materially diminish T-Mobile's network performance in the Jacksonville area, reducing the average and peak speeds available to T-Mobile customers. For example, loss of access to the Channels would reduce T-Mobile's long-term 5G average user download speeds by approximately 27%. Such a loss of network performance would critically affect a host of functions, including without limitation the data services that T-Mobile provides to emergency responders, schools, and libraries, to say nothing

of the over 1 million individuals and businesses served by T-Mobile in the Jacksonville area. Those harms are not remediable in damages.

45. The parties contemplated these issues at the time they signed the Lease Agreement. They agreed that any breach of the Lease Agreement could not be easily quantified in damages and that specific performance would be the appropriate remedy for any breach by the Board:

> **Specific Performance**. Licensee acknowledges that the License and Channels subject to this Agreement are unique and the loss to [WBSY] due to *Licensee's failure to perform this Agreement could not be easily measured with damages. [WBSY] will be entitled to injunctive relief and specific enforcement* of this Agreement in a court of equity without proof of specific monetary damages, but without waiving any right thereto, in the event of breach of this Agreement by Licensee.

Ex. C (Lease Agreement) § 20(d). Thus, specific performance is both mandated under the Lease Agreement and the only effective means of compensating WBSY for the Board's ongoing breach.

## CAUSES OF ACTION

### First Claim for Relief—Breach of Contract

46. WBSY repeats and re-alleges all of the allegations of the preceding paragraphs as if they were fully set forth herein.

47. The Lease Agreement is a valid contract between WBSY and the Board, the terms of which are clear, definite, and certain.

48. WBSY complied with all conditions precedent, if any, and fully performed its obligations under the Lease Agreement.

49. The Board agreed to the terms of the Lease Agreement, including WBSY's Purchase Right, which imposes on the Board a legally enforceable obligation to "enter into a purchase and sale agreement" for the License "[p]romptly" after the Board receives written notice of WBSY's intent to exercise its Purchase Right.

50. The Board breached this legally enforceable obligation by failing to execute an Asset Purchase Agreement for the sale of the License "[p]romptly" after WBSY sent the August 26, 2020 notice of intent to exercise the Purchase Right. As of the date of this complaint, the Board still has not executed the Asset Purchase Agreement; affirmatively refuses to execute any such agreement; and has asserted that WBSY's Purchase Right under the Lease Agreement is not valid because the Board seeks more money than it bargained for in June 2017.

51. At all times after it sent the August 26, 2020 notice of intent to exercise its Purchase Right, WBSY has been, and continues to be, ready, willing, and able to execute the Purchase Right.

52. WBSY has been, and is being, irreparably injured by the Board's breach of its legally enforceable obligations under the Lease Agreement.

53. Monetary damages are inadequate to remedy the injury to WBSY, as explained above.

54. Specific performance is the required and agreed remedy for breach under Section 20(d) the Lease Agreement. Such a remedy would not work an unjust or oppressive result on any party; to the contrary, specific performance would ensure that WBSY receives the irreplaceable benefits of the bargain it struck with the Board and would prevent the Board—a large and sophisticated public entity—from repudiating its contractual commitments simply because it no longer deems those commitments to be commercially advantageous.

## **PRAYER FOR RELIEF**

WHEREFORE, WBSY respectfully requests:

A. An order compelling the Board specifically to perform its obligation under the Lease Agreement to "[p]romptly . . . enter into a purchase and sale agreement" for the License; and

B. Reasonable attorneys' fees and costs, as required by Section 20(f) of the Lease Agreement; and

C. Any and all other relief the Court deems appropriate.

Dated:  August 20, 2021

                                   Respectfully submitted,

*/s/ Michael A. Abel*
ABEL BEAN LAW
Michael A. Abel
Florida Bar No. 0075078
Jared J. Burns
Florida Bar No. 1003415
100 N. Laura Street
Suite 501
Jacksonville, FL 32202
Telephone:  (904) 944-4100
mabel@abelbeanlaw.com
jburns@abelbeanlaw.com


WILLIAMS & CONNOLLY LLP
Kenneth J. Brown*
Jessica Bodger Rydstrom*
Denis R. Hurley*
725 Twelfth Street N.W.
Washington, DC 20005
Telephone:  (202) 434-5000
Facsimile:  (202) 434-5029
kbrown@wc.com
jrydstrom@wc.com
dhurley@wc.com

*application for admission *pro hac vice* forthcoming

*Attorneys for Plaintiff WBSY Licensing, LLC*